UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOSEPH LLOYD EDWARDS,         )
# 530451,                      )
                               )
          Petitioner,        )    Case No. 1:11-cv-381
                               )
v.                             )    Honorable Paul L. Maloney
                               )
WILLIE SMITH,                  )
                               )
          Respondent.        )
_____  )

## OPINION

This is a habeas corpus proceeding brought *pro se* by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury of assault with the intent to do great bodily harm less than murder, and he was sentenced to six years and eleven months to fifteen years' imprisonment. After unsuccessful attempts to overturn his conviction in state court, petitioner seeks federal habeas corpus relief on a single ground, one rejected by the Michigan Court of Appeals:

> Both trial court and court of appeals erred in denying [his] right to introduce evidence that was relevant to an essential element of his defense. This violates the defendant's constitutional right to present his defense.

(Petition, ECF No. 1, PageID.3).[1]

---

[1] The Court is interpreting the petition indulgently. Petitioner left blank that section of the petition in which he was to state his grounds for relief, and he provided no statement of supporting facts. (*See* Petition, PageID.6-11). Having no other explanation from petitioner, the Court has considered his arguments to the Michigan Court of Appeals regarding this issue. (*See* Appellant's Br. at 8-13, ECF No. 20).

Respondent has answered the petition. (ECF No. 10). He argues that the petition should be denied for lack of merit. (*See id.*, PageID.106-10).

After reviewing the state-court record, the Court concludes that petitioner is not entitled to federal habeas relief. He has not shown that the state court decisions rejecting the ground raised in the petition were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States"; nor has he demonstrated that they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d). Accordingly, the petition will be denied on the merits.

## Procedural History

Petitioner's conviction arises from a series of disputes he had with his neighbor, Brian Marentette. The disputes resulted in a September 28, 2007, assault in which petitioner struck Mr. Marentette repeatedly with an aluminum baseball bat, including at least two blows to the head. Petitioner was charged with assault with intent to commit murder, Mich. Comp. Laws § 750.83. (ECF No. 12).

Petitioner was tried before a Dickinson County Circuit Court jury for four days, beginning February 25, 2008, and concluding February 28, 2008.[2] He was represented by counsel. The jury found him guilty of the lesser included offense of assault with

---

[2]Transcripts of the trial proceedings will be designated as follows:
- February 25, 2008 (ECF No. 15): "Tr. I at __."
- February 26, 2008 (ECF No. 16): "Tr. II at __."
- February 27, 2008 (ECF No. 17): "Tr. III at __."
- February 28, 2008 (ECF No. 18): "Tr. IV at __."

-2-

intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84. (Tr. IV at 4). On April 21, 2008, Circuit Judge Celello sentenced petitioner to six years eleven months to fifteen years' imprisonment. (Sentencing Transcript at 19, ECF No. 19).

### A.   Trial Evidence

Brian Marentette testified that he had been petitioner's neighbor in a three-unit apartment building, and that he had planned to move into the apartment in which petitioner had been living. (Tr. I at 224-28). That and a dispute over a cat led to conflict between the two men. (*Id.* at 225, 227-28). Mr. Marentette went to a bar on September 28, 2007, to play pool and drink beer. (*Id.* at 225-26). Petitioner came to the bar in the late afternoon and attempted to speak to him, but Mr. Marentette rebuffed him. (*Id.* at 226-27). Shortly thereafter, the two men left the bar. (*Id.* at 227). They discussed their disputes about their living arrangement and the cat. (*Id.* at 227-28). When the conversation ended, Mr. Marentette went back to the bar for about fifteen minutes before heading home. (*Id.* at 229-31).

Mr. Marentette testified that, on his way home, petitioner approached him and hit him in his forehead with a baseball bat. (*Id.* at 231-32). Mr. Marentette described being in a great deal of pain and being blinded by blood. (*Id.* at 232). After a second blow, Mr. Marentette fell to the ground and tried to get away. (*Id.* at 232-33). Petitioner continued to hit Mr. Marentette with the bat, striking blows to his arms and back. (*Id.* at 233). Mr. Marentette denied having a weapon and making any aggressive moves toward petitioner. (*Id.* at 233-34). Mr. Marentette stated that, during the assault, he feared he was going to die. (*Id.* at 234-35).

Theresa Hedrick lived in the same apartment building as petitioner and Mr. Marentette. (Tr. II at 9). She testified that, on September 28, 2007, petitioner came to her apartment and asked for a bat, which her daughter, Audrianna Trujillo, gave him. (*Id.* at 10-11). It was an aluminum bat. (*Id.* at 11). Ms. Hedrick described petitioner's demeanor at the time as "laughing and joking" with her daughter. (*Id.* at 12). A "couple minutes" later, she observed petitioner and Mr. Marentette "fighting out on the corner." (*Id.* at 13). She saw petitioner hit Mr. Marentette with the bat several times. (*Id.* at 15-18). She described how petitioner continued to hit Mr. Marentette on his head and other parts of his body until he was "all the way to the ground." (*Id.* at 16-18).

Twelve-year-old Audrianna Trujillo testified that petitioner came to her apartment and asked to borrow a baseball bat. (Tr. II at 33-34). She noted that her mother was in the apartment at the time. (*Id.* at 34). She later witnessed petitioner hit Mr. Marentette with the bat four or five times in the upper part of his body. (*Id.* at 35-37). She described the blows as "hard" and "fast." (*Id.* at 37).

Carmen Vincent was a witness to the September 28, 2007, assault. She first observed petitioner and Mr. Marentette arguing and pushing each other. (Tr. II at 62-65). She later observed petitioner return with an aluminum bat, say something to the effect that he wanted Mr. Marentette to stop following him, and then hit Mr. Marentette several times, knocking him to the ground. (*Id.* at 69-71). After Mr. Marentette was on the ground, petitioner "started pounding on his head with the bat." (*Id.* at 71-72). She described hearing "a cracking sound, you know like-like a melon

-4-

hitting the ground . . . it sounded like a crack like he cracked his head open." (*Id.* at 73). Ms. Vincent did not hear Mr. Marentette say anything. (*Id.* at 71). She called 911 as she ran toward the two men, telling petitioner: "You're gonna kill him. What the heck are you doing?" (*Id.* at 73). After the last time he hit Mr. Marentette in the head, petitioner commented: "I'd do it again if he doesn't stop following me." (*Id.* at 75).

Ms. Vincent's mother, Jean Vincent, witnessed the assault, and she corroborated her daughter's testimony about what occurred. (Tr. II at 90-98). She was seated behind the steering wheel of her vehicle at the time, and she blew her car horn in an attempt to distract petitioner from his assault on Mr. Marentette. (*Id.* at 98).

James Miller was an acquaintance of petitioner. (Tr. II at 106-07). He testified that, on September 28, 2007, petitioner was at his apartment "having a few drinks." (*Id.* at 107-08). Sometime in the late afternoon or early evening, petitioner left to get some "mix" for their drinks. (*Id.* at 108). Petitioner returned fifteen to twenty minutes later, asking Mr. Miller to hide him because he had been in a fight and "thought he beat someone up pretty bad." (*Id.* at 109). Petitioner was holding an aluminum baseball bat. (*Id.* at 109-10). Petitioner left at Mr. Miller's direction and, shortly thereafter, the police arrived looking for petitioner. (*Id.* at 111-12).

Joseph Donohue, M.D., is a surgeon who treated Mr. Marentette. (Tr. II at 46). He described the injuries Mr. Marentette sustained as a "a laceration over his lip, a large laceration on his left forehead, on the left parietal area . . . a frontal bone fracture"; a "[s]uperior orbital fracture on the left side"; a "[s]prained wrist"; and "multiple contusions on his back." (*Id.* at 48). The doctor opined that the injuries were

-5-

consistent with Mr. Marentette having been beaten by a baseball bat, and that they were potentially life threatening if left untreated. (*Id.* at 49-51). On cross-examination, Dr. Donohue acknowledged that none of the blows to Mr. Marentette's head caused a concussion or a closed-head injury. (*Id.* at 60).

Officer Edwin Mattson of the Iron Mountain Police Department was one of the first responders to the scene of the assault. He testified that he observed Mr. Marentette lying on the ground with a "significant amount" of blood, and that he had suffered head injuries. (Tr. I at 190-91). The officer described the injuries as "quite bloody" with blood coming from "various points of his head." (*Id.* at 192). He took photographs of Mr. Marentette's head injuries at the hospital, which were admitted and shown to the jury. (*Id.* at 198-202). Officer Mattson testified that the police recovered an aluminum baseball bat at the location in which petitioner had been arrested. (*Id.* at 202). The officer showed the bat to Audrianna Trujillo and her mother, Theresa Hedrick, both of whom identified it as their bat. (*Id.* at 203-04). Officer Mattson recounted statements petitioner made after his arrest: that he had gotten the bat in order to keep Mr. Marentette away; that he hit Mr. Marentette with the bat because Mr. Marentette kept trying to take the bat; and that he denied having hit Mr. Marentette after he was on the ground. (*Id.* at 207-08).

Officer Adam Ray was involved in petitioner's arrest. (Tr. II at 129-34). He testified that, after his arrest, petitioner volunteered a statement to the effect "Did I kill somebody?" (*Id.* at 137).

The defense called three witnesses, including petitioner. Petitioner testified that he had served in the Marine Corps for three years, and that he was honorably discharged in 1984. (Tr. III at 23-24). He and Mr. Marentette did not get along. They had disputes about a number of matters, including "a girl," "bike tires," and ownership of a cat (*Id.* at 27-28). Their disputes never became physical until September 28, 2007. (*Id.* at 28).

On that day, petitioner had been drinking alcohol. (*Id.* at 31-33). He needed more Kool-Aid to mix with his vodka, so he went to the bar looking for a woman he thought would give him some. (*Id.* at 33-34). He encountered Mr. Marentette at the bar. (*Id.* at 34). Petitioner testified that Mr. Marentette became upset with him and left the bar; petitioner left the bar shortly thereafter, headed toward Theresa Hedrick's apartment to get some Kool-Aid. (*Id.* at 34-35). He encountered Mr. Marentette outside the bar, and an argument ensued. (*Id.* at 35-36). According to petitioner, Mr. Marentette kept following him, eventually running after him and "making threatening gestures." (*Id.* at 36-37).

Petitioner testified that, when he arrived at Ms. Hedrick's apartment, he asked her for some Kool-Aid. (*Id.* at 41). After Ms. Hedrick advised him that she had none, petitioner "bummed a cigarette" and smoked it in her apartment while he told her about the incident with Mr. Marentette. (*Id.* at 41-42). Petitioner testified that he borrowed the baseball bat from Ms. Hedrick for self-protection against Mr. Marentette. (*Id.* at 42).

Petitioner testified that, when he left Ms. Hedrick's apartment, he saw Mr. Marentette on the street. (*Id.* at 44-45). He claimed that Mr. Marentette chased after him and, at one point, jumped out from some bushes and tried to take the baseball bat away from him. (*Id.* at 45-46). Petitioner described Mr. Marentette as the aggressor and his own actions as defensive. (*Id.* at 46-48). He asserted that only after Mr. Marentette threaten to kill him did he hit him a number of times with the bat. (*Id.* at 49-50).

Petitioner testified that he and Mr. Marentette struggled over the bat, and that Mr. Marentette eventually "got control" and swung the bat at petitioner's head. (*Id.* at 50). He claimed that, after he took the bat back, he hit Mr. Marentette on the head. (*Id.* at 51). Petitioner denied hitting Mr. Marentette in the head after he was on the ground. (*Id.* at 51-52). He also denied seeing any blood on Mr. Marentette. (*Id.* at 52). Petitioner stated that he fled from the scene because he "panicked." (*Id.* at 53).

Defense witness William Weinfurter testified that he observed petitioner and Mr. Marentette arguing in the bar on September 28, 2007. (Tr. III at 4-6). Mr. Marentette yelled at petitioner not to talk to him, just before he "stormed out the door." (*Id.* at 6). A few minutes later, petitioner left the bar. (*Id.* at 7-8).

Defense witness Joseph Gille was the landlord of the apartment building in which petitioner and Mr. Marentette lived. (Tr. III at 9-11). Mr. Gille testified that petitioner and Mr. Marentette did not get along. (*Id.* at 14). He described a conversation he had with Mr. Marentette after the September 28, 2007, assault in

-8-

which Mr. Marentette stated that he had taunted petitioner and had tried to take the bat away from him. (*Id.* at 16).

### B.   Character Evidence Regarding Mr. Marentette

At the end of the first day of trial, and during a hearing outside the presence of the jury, the prosecutor raised an objection to the defense's anticipated proffer of evidence that, prior to the assault, Mr. Marentette had engaged in inappropriate conduct, holding down twelve-year-old Audrianna Trujillo, tickling her, and engaging in inappropriate touching. (Tr. I at 253-55). The next morning, before the jury returned to the courtroom, Judge Celello conducted a hearing on the issue. (Tr. II at 3-7). Defense counsel argued that the evidence was relevant to petitioner's claim of self-defense because petitioner had been the one who intervened between Mr. Marentette and Audrianna Trujillo, and that incident led petitioner to believe that Mr. Marentette was a potential threat to him. (*Id.* at 4-5).

Judge Celello ruled the evidence inadmissible, noting:

> I am finding that it's not logically relevant or legally relevant, and even if it were, it's being offered to prove the character of Mr. Marentette, and under [MRE] 404a(2) deals with the character of the alleged victim of a homicide. It says nothing about . . . an attempted homicide. And even in [MRE] 404 the Prosecution, before the defense can offer that evidence, has to put the character of the victim at issue and he has not done that in this case.

(Tr. II at 7).

### C.   Post-Conviction Proceedings

Petitioner appealed his conviction to the Michigan Court of Appeals, raising three issues, including the ground in his pending habeas petition. On October 22,

2009, the Court of Appeals affirmed his conviction in an unpublished opinion. *People v. Edwards*, No. 288037 (ECF No. 1-1, PageID.21- 23). On March 29, 2010, the Michigan Supreme Court denied his application for leave to appeal. *People v. Edwards*, No. 140218 (ECF No. 21).

On April 14, 2011, petitioner filed his petition for federal habeas corpus relief. (Petition, ECF No. 1).

## Standard of Review

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA

prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*,

134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254 (d)(2) requires that this Court

accord the state trial court substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013)

## Discussion

### I. Right to Present a Defense

The Supreme Court has recognized a criminal defendant's right to present a defense. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). This latitude is limited, however. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).

This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). "While the Constitution thus prohibits exclusion of defense evidence under rules that serve no legitimate purpose or that they are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed

by certain other factors such as unfair prejudice, confusion of issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. at 326. "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. at 308.

In his direct appeal, petitioner argued that the trial court erred by excluding as irrelevant the testimony of a twelve-year-old girl that Mr. Marentette had touched her in an inappropriate manner while tickling her. He asserted that this evidence was relevant to his self-defense claim because the incident influenced his perception of the risks he faced from Mr. Marentette. Petitioner contends that the exclusion of the evidence violated his constitutional right to present a defense.

The Michigan Court of Appeals rejected petitioner's argument:

> [Petitioner] fails to explain how [Mr.] Marentette's alleged inappropriate behavior with the girl contributed to his fear of danger. The record contains no reference to establish the date of the alleged inappropriate touching. Moreover, [petitioner] acknowledged that the alleged incident involved no violence between him and [Mr.] Marentette. Under these circumstances, the trial court was within its discretion to find the evidence irrelevant.

(Op. at 2, ECF No. 1-1, PageID.22) (citing *People v. Rockwell*, 188 Mich. App. 405, 410-11; 470 N.W.2d 673 (1991)). The court of appeals also held that, because the character evidence was irrelevant, its exclusion did not violate petitioner's constitutional right to present a defense. (Op. at 2 (citing *People v. Unger*, 278 Mich. App. 210, 250, 749 N.W.2d 272 (2008)).

This Court finds no error in the analysis of the trial court or the court of appeals regarding the relevance of the victim's purported character evidence. Petitioner

certainly has not demonstrated that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; nor has he shown that they were "based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Accordingly, his only ground for habeas relief fails on its merits.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDonnell*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the Court has examined petitioner's claim under the *Slack* standard.

Petitioner cannot demonstrate that reasonable jurists would find that the denial of habeas corpus relief on the ground raised in his petition is debatable or wrong. *See Slack*, 529 U.S. at 484. Accordingly, the Court will enter an order denying petitioner a certificate of appealability.

## **Conclusion**

For the foregoing reasons, the petition will be denied.


Dated:   September 6, 2016          /s/  Paul L. Maloney
                                    United States District Judge